NB:CNC
F.#2009R00589

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    -against-

MICHAEL GOLDSTEIN,
   also known as "Scott Flax,"

              Defendant.

- - - - - - - - - - - - - - - - -X

**MJ-13-17**

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT OF
AN ARREST WARRANT

(18 U.S.C. § 1343)

RECEIVED
IN CHAMBERS OF
A. KATHLEEN TOMLINSON
★ JAN 10 2013 ★
TIME A.M. _____
      P.M. _____

EASTERN DISTRICT OF NEW YORK, SS:

      DAN J. SCHLEYER, being duly sworn, deposes and says that he is a Special Agent with the United States Internal Revenue Service ("IRS"), duly appointed according to law and acting as such.

      Upon information and belief, in or about and between January 2008 and January 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL GOLDSTEIN, also known as "Scott Flax," did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate commerce, signs, signals and sounds.

      (Title 18, United States Code, Section 1343)

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

## I. Qualifications and Training

1. I have been a Special Agent with the United States Internal Revenue Service ("IRS") for approximately seventeen (17) years. During my career as a Special Agent, I have participated in hundreds of investigations of violations of the Internal Revenue Code. In addition to investigating numerous cases of tax fraud, I have investigated many cases involving mail and wire fraud.

2. The facts set forth in this affidavit are based on my personal knowledge and observations, my conversations with other law enforcement officers, my interviews of witnesses, my interview of the defendant, my review of numerous documents pertaining to this investigation, including bank records and email communications, and my training and experience.

## II. Introduction

3. On or about September 17, 2007, the defendant MICHAEL GOLDSTEIN began working for Avant-Garde Optics d/b/a Luxottica ("Luxottica") in Port Washington, New York as a project manager for John Doe #1, the Vice President of Operations-Senior Projects

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not set forth all of the facts and circumstances of which I am aware. Moreover, where the statements of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

2

Manager. Among other things, GOLDSTEIN was responsible for securing vendors, approving invoices and providing general assistance to the Vice President of Operations.

4. One of GOLDSTEIN's projects at Luxottica was to secure a new food service vendor for the Luxottica cafeteria. GOLDSTEIN and Jane Doe #1, a Luxottica employee and the co-chair of the facilities committee, worked to find a new food service vendor for the cafeteria after receiving numerous complaints about the quality of food in the cafeteria.

### III. The Scheme to Defraud

A. GOLDSTEIN's Agreement with A Special Affair

5. In or about early 2008, GOLDSTEIN contacted John Doe #2, the owner of A Special Affair, a catering business located in Farmingdale, New York, regarding a possible catering opportunity at Luxottica. Subsequently, John Doe #2 went to Luxottica and made a presentation of food to the Luxottica executives.

6. GOLDSTEIN told Luxottica executives that he had conducted a competitive bidding process and had arranged for Silver Spoons, which GOLDSTEIN represented to Luxottica executives as being John Doe #2's company, to serve as the new food service vendor for Luxottica's cafeteria.[2] Luxottica executives agreed to hire Silver Spoons.

---

[2] As discussed further below, the investigation revealed that Silver Spoons was GOLDSTEIN's company. In fact, during a March 15, 2010 meeting with the government, GOLDSTEIN admitted that Silver Spoons

3

7. John Doe #2 entered into an oral agreement with GOLDSTEIN to provide cafeteria services at Luxottica for $15,000.00 per month, plus reimbursement for catering and tabs. John Doe #2 also agreed to give GOLDSTEIN 20% of gross receipts in cash every week.

8. In or around May 2008, John Doe #2 began working in Luxottica's cafeteria without a written contract. John Doe #2 ran the cafeteria and operated the cash register. John Doe #2 advised agents, in sum and substance, that he did not sign a contract because the contract GOLDSTEIN presented to John Doe #2 was between A Special Affair and Silver Spoons, rather than between A Special Affair and Luxottica.

9. John Doe #2 further reported that he submitted his monthly bills to GOLDSTEIN, who was his only point of contact at Luxottica. John Doe #2 then received payment from Silver Spoons by check, which GOLDSTEIN usually handed to John Doe #2 in person. Occasionally, John Doe #2 received a check in the mail from Silver Spoons for cafeteria services.

10. Pursuant to the oral agreement between GOLDSTEIN and John Doe #2, John Doe #2 gave GOLDSTEIN cash payments representing 20% of gross receipts on a weekly basis. John Doe #2 personally handed the cash to GOLDSTEIN and attempted to have GOLDSTEIN sign a receipt for the cash, but GOLDSTEIN refused to sign a receipt. The

---

was his company.

investigation revealed that, on or about and between May 2008 and January 2009, John Doe #2 paid GOLDSTEIN approximately $27,150.00 in cash.

11. During this time period -- May 2008 through January 2009 -- Luxottica executives did not know that: (a) GOLDSTEIN was affiliated with Silver Spoons, (b) GOLDSTEIN retained a portion of each payment from Luxottica to Silver Spoons for cafeteria services, or (c) John Doe #2 paid 20% of his gross receipts to GOLDSTEIN every week. GOLDSTEIN's responsibility for finding a new food service vendor for the Luxottica cafeteria was part of his duties as project manager for the Vice President of Operations, for which he was paid a salary.

12. In or about September 2008, John Doe #2 asked GOLDSTEIN to arrange a meeting between John Doe #2 and John Doe #1, the Vice President of Operations, to discuss drafting a written contract between Luxottica and A Special Affair. GOLDSTEIN refused to allow John Doe #2 to meet with John Doe #1 or to let John Doe #2 discuss A Special Affair's operation at Luxottica with anyone other than GOLDSTEIN.

B. <u>Luxottica's Agreement with Silver Spoons</u>

13. Unbeknownst to his employer, GOLDSTEIN negotiated a contract between his company, Silver Spoons, and Luxottica for food services. Through his shell company, Silver Spoons, GOLDSTEIN hired John Doe #2 of A Special Affair to provide food services for the

Luxottica cafeteria. Luxottica executives believed that GOLDSTEIN, in his capacity as a Luxottica employee, acted as the liaison between Luxottica and John Doe #2, whom they believed operated Silver Spoons. Luxottica officials were not aware that John Doe #2's company was a different company, called A Special Affair.

14. As part of his scheme to defraud Luxottica, GOLDSTEIN submitted monthly invoices to Luxottica on behalf of Silver Spoons that far exceeded John Doe #2's invoices. This resulted in a monthly gain of approximately $8,000.00 per month for GOLDSTEIN.

15. Luxottica made monthly payments to Silver Spoons by check. The majority of the checks for Silver Spoons were given to GOLDSTEIN at Luxottica. However, one check was mailed to a Park Avenue, New York City address, which, as I learned during this investigation, is the address for one of GOLDSTEIN's other companies. After that check was mailed, GOLDSTEIN asked an employee in Luxottica's accounts payable department not to mail out any other checks to Silver Spoons. The investigation further revealed that the checks from Luxottica made payable to Silver Spoons were deposited into a Washington Mutual bank account in the name of "Medichat dba Silver Spoons," which is a company owned by GOLDSTEIN. GOLDSTEIN is the sole signatory on the Medichat bank account.

16. Based on my review of records obtained during this investigation, in or about and between May 2008 and January 2009,

6

Luxottica paid Silver Spoons approximately $227,335.00 for cafeteria services. After paying John Doe #2 approximately $140,438.83, GOLDSTEIN retained a profit of approximately $86,896.17. In addition, as noted in paragraph 10, above, GOLDSTEIN received approximately $27,150.00 in cash from John Doe #2.

      C.    <u>GOLDSTEIN's Email Communications with Luxottica's In-House Counsel</u>

17. On November 6, 2008 at 10:48 a.m., a Gmail electronic mail account, silverspoonsfoodmanagement@gmail.com, was created (the "Silver Spoons Gmail account"). Gmail is administered by the corporation Google, which houses its servers in California. The investigation revealed that the IP address that was used to create the Silver Spoons Gmail account on November 6, 2008 at 10:48 a.m., can be traced to Luxottica's offices in Port Washington, New York. Luxottica's records reveal that GOLDSTEIN was present at Luxottica the day the Gmail account was created. As discussed in more detail below, all but one of the emails from the Silver Spoons Gmail account to Luxottica's in-house counsel were signed by "Scott Flax." As discussed further below, GOLDSTEIN used the alias "Scott Flax" to communicate with Luxottica's in-house counsel on behalf of Silver Spoons and to conceal his own identity. GOLDSTEIN was included as a "cc" on four of the emails from "Scott Flax." Luxottica's visitor

7

log reveals that nobody named "Scott Flax" or "Scott" entered Luxottica on November 6, 2008.[3]

18. On or about November 6, 2008, GOLDSTEIN, using the Silver Spoons Gmail account and signing the emails as "Scott Flax," and Luxottica's in-house counsel, Jane Doe #2, began communicating via email regarding a formal contract between Silver Spoons and Luxottica. Although Luxottica had been paying Silver Spoons for cafeteria services since approximately May 2008, a written contract did not exist between Silver Spoons and Luxottica.

19. On November 6, 2008 at 11:00 a.m., twelve minutes after the Silver Spoons Gmail account was created, GOLDSTEIN, using the alias "Scott Flax," sent Jane Doe #2 an email, attaching a proposed draft food services contract between Silver Spoons and Luxottica. The "author" of the electronic document (the proposed contract) is identified as "MGOLDSTEIN" under the "Properties" feature of the document. The email to Jane Doe #2 was sent through Google's servers in California before arriving at Luxottica in Port Washington, New York.

20. On or about and between November 6, 2008 and December 11, 2008, Jane Doe #2 corresponded with whom she believed to be "Scott Flax," but was actually GOLDSTEIN, via email several times regarding

---

[3] In fact, my review of the Luxottica visitor logs for the time period of February 6, 2008 through November 20, 2009 reveals that nobody named "Scott Flax" entered Luxottica during that entire time period.

8

changes that needed to be made to the contract between Silver Spoons and Luxottica. On December 11, 2008, GOLDSTEIN, as "Scott Flax," emailed Jane Doe #2 and asked her to send two signed hard copies of the contract to Silver Spoons's "new regional address." The address GOLDSTEIN (as "Scott Flax") provided was a post office box (P.O. Box) at the Roosevelt Field Post Office in Garden City, New York. Jane Doe #2 subsequently mailed a hard copy of the contract to that address.

21. The investigation reveals that, on or about December 10, 2008, GOLDSTEIN applied for and obtained the P.O. Box described in the December 11, 2008 email from "Scott Flax" to Jane Doe #2. GOLDSTEIN's name appears on the application for the P.O. Box as the applicant. Furthermore, on the application, GOLDSTEIN described himself as the founder of Silver Spoons.

22. In summary, the following facts establish that GOLDSTEIN was "Scott Flax":

a. The IP address used to create the Silver Spoons Gmail account on November 6, 2008 at 10:48 a.m. can be traced to Luxottica's offices in Port Washington, New York. GOLDSTEIN was present at Luxottica the day the Gmail account was created; there is no record of a "Scott Flax" or "Scott" being at Luxottica that day.

   b. The "author" of the proposed draft food services contract that "Scott Flax" sent to Jane Doe #2 via email on November 6, 2008 at 11:00 a.m. was identified as "MGOLDSTEIN" under the "Properties" feature of the electronic document.

   c. On December 11, 2008, "Scott Flax" asked Jane Doe #2 to send two signed hard copies of the contract to a P.O. Box in Garden City, New York. The investigation revealed that, one day earlier, GOLDSTEIN applied for the P.O. Box described in the December 11, 2008 email from "Scott Flax" to Jane Doe #2 and that GOLDSTEIN identified himself on the application as the founder of Silver Spoons.

  23. Based on the information I am currently aware of, the loss to Luxottica due to GOLDSTEIN's scheme is at least $86,896.17.

## IV. The Interview of defendant MICHAEL GOLDSTEIN

  24. On March 15, 2010, GOLDSTEIN and his attorney met with me, a Special Agent of the United States Postal Inspection Service, and an Assistant United States Attorney at the United States Attorney's Office in Central Islip, New York. GOLDSTEIN agreed to answer the government's questions without a proffer agreement. GOLDSTEIN admitted that he owned Silver Spoons. According to GOLDSTEIN, Silver Spoons is a company that sub-contracts and oversees catering companies.

25. Based on my knowledge of this investigation and my training and experience, I believe that many of the statements made by GOLDSTEIN during the interview were untrue. For instance, GOLDSTEIN stated that he met "Scott Flax" at an event and that GOLDSTEIN later hired "Flax" to work for Silver Spoons on commission. GOLDSTEIN further stated, in sum and substance, that "Flax" negotiated the terms of a contract on behalf of Silver Spoons with Luxottica. GOLDSTEIN was unable to provide any contact information for "Flax." Because of the facts discussed above, in paragraphs 17 through 22, I believe GOLDSTEIN invented "Flax" as part of his scheme to defraud Luxottica.

26. GOLDSTEIN further claimed, in sum and substance, that Luxottica employees, including his supervisor, were aware that GOLDSTEIN owned Silver Spoons. My investigation, including interviews of several Luxottica employees and executives, revealed that no one I spoke to at Luxottica knew that GOLDSTEIN owned, or had an interest in, Silver Spoons prior to January 2009. Moreover, as discussed above, GOLDSTEIN created the fictitious identity "Scott Flax" to communicate with Luxottica's in-house counsel on behalf of Silver Spoons and to conceal his own identity.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant MICHAEL GOLDSTEIN, also known as "Scott Flax," so that he may be dealt with according to law.

Given the nature of this application, your deponent respectfully requests that this Affidavit and the Arrest Warrant be filed under seal until further order of the Court.

_____
DAN J. SCHLEYER
Special Agent
U.S. Internal Revenue Service

Sworn to before me this
10th day of January, 2013

_____
HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK